IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RUFUS WEST, a/k/a MANSA LUTALO IYAPO,

               Plaintiff,

     v.

GREGORY GRAMS, MIKE MEISNER,
MARDEL PETRAS, RICK RAEMISCH,
GARY HAMBLIN, CHAPLAIN CAMPBELL,
CHAPLAIN MARK TESLIK, JOHN DOE DAI
ADMINISTRATORS, WILLIAM GROSSHANS,
MELISSA SCHUELER, DAVID LIPINSKI
and GLEN BENNETT,[1]

               Defendants.

OPINION and ORDER

11-cv-687-slc

---

Plaintiff Mansa Lutalo Iyapo (who was incarcerated under the name Rufus West but asks to be referred to by his "spiritual name"), is a Muslim inmate proceeding on claims that prison officials are: (1) violating his rights under the First Amendment's Free Exercise Clause and under the Religious Land Use and Institutionalized Persons Act (RLUIPA) by prohibiting Jumu'ah, Talim and Eid al-Fitr services to be held without a volunteer leader from outside the prison; and (2) violating his rights under the First Amendment by retaliating against him for debating when it is proper to serve meals to Muslim inmates during Ramadan.

In a March 25, 2013 order, I denied plaintiff's motion for preliminary injunctive relief. Now before the court are the parties' cross motions for summary judgment, along with plaintiff's

---

[1] The court has amended the caption to reflect that David Lipinski and Glen Bennett are the "John Doe" security supervisor and the "John Doe" food service supervisor, respectively. This is complicated somewhat by defendants initially naming the food service supervisor's first name as "Rick" but subsequently filing documents indicating that his name is "Glen." Because there is no indication that the parties are referring to two people, the court will assume that Glen Bennett is the proper defendant. It seems that the parties have not agreed on the identity of the Doe "DAI administrators," but because I am granting summary judgment in favor of all defendants, it is unnecessary to sort this out.

motions regarding storage of his legal file and motion for appointment of counsel.  For the reasons stated below, I am granting defendants' motion for summary judgment, denying plaintiff's motion for summary judgment and directing the clerk of court to enter judgment in favor of defendants.  I am denying as moot plaintiff's motions regarding storage of his legal file and for appointment of counsel.

CROSS MOTIONS FOR SUMMARY JUDGMENT

The parties have filed cross motions for summary judgment.  In addition, the parties' proposed findings of fact incorporate the proposed findings from the parties' earlier briefing of plaintiff's motion for preliminary injunctive relief.  I find from these multiple sets of proposed findings of fact  and supporting materials that the following facts are material and undisputed, unless otherwise noted:

**I.  Facts**

**A. Parties**

Plaintiff Mansa Lutalo Iyapo is a prisoner of the State of Wisconsin.  Since July 3, 2007, he has been incarcerated at the Columbia Correctional Institution (CCI), a maximum-security prison.  Defendant Gregory Grams was the warden at CCI from December 25, 2004 through April 30, 2011.  Defendant Mike Meisner has been the warden at CCI since April 24, 2011. Defendant Mardel Petras was a correctional program supervisor at CCI from November 5, 2000 through April 1, 2011. Defendant Rick Raemisch was the Secretary of the Wisconsin Department of Corrections (DOC) from September 1, 2007 through December 31, 2010.

2

Defendant Leo Campbell was a chaplain at CCI from May 13, 2007 through April 30, 2012. Defendant Gary Hamblin became the Secretary of DOC on January 3, 2011.[2]   Defendant William Grosshans was employed at the DOC Division of Adult Institutions from January 18, 2009 through January 3, 2011.  Defendant Mark Teslik has been a chaplain at CCI since December 5, 2010.  Defendant Melissa Schueler is a corrections program supervisor at CCI. David Lipinski has been a shift captain at CCI since May 9, 2010.  Glen Bennett is the food service manager at CCI.

**B. DOC policies**

It is the DOC's policy that incarcerated inmates have opportunities to pursue lawful religious practices of the religion of their choice consistent with security practices and principles, rehabilitative goals of inmates, health and safety, allocation of limited resources, and responsibilities and needs of the correctional institution and facilities.  DAI Policy # 309.61.01 sets forth a structure to accommodate the religious beliefs and practices of DOC inmates. Inmates may exercise their religious beliefs and practices in the following ways: (1) congregate services; (2) religious diet requests; (3) individual study; (4) personal meditation; (5) utilization of religious books and/or property; (6) celebration of a religious feast; (7) individual religious observance in their living quarters; (8) correspondence with fellow believers; (9) pastoral visits; and (10) requesting to abstain from work or program on religious days of observance.

---

[2] Hamblin retired as DOC secretary  in late 2012.

DAI Policy 309.61.01 states in part as follows: "Under no circumstances are inmates authorized to lead or conduct a religious service or study group." The parties agree that sometime in the past, CCI prisoners were allowed to lead Islamic prayers, but dispute whether this was stopped in 2005 or 2006.

Defendants assert that prison security is threatened when individual inmates are able to differentiate themselves and be seen as leaders of a group. Defendants are concerned that allowing inmates to lead religious activities would give a perception of authority over other inmates, could allow an inmate to influence other inmates' actions, and would blur the necessary distinction between staff and inmates. On the other hand, plaintiff points out that CCI allows prisoners to organize softball and basketball teams, on which inmates are allowed to have leadership positions such as captain or manager.

Defendants respond that:

- DOC historically and continually has had problems with gangs attempting to take over religious groups, with the religious groups then affording cover for gang activity;

- Allowing an inmate to lead a religious group empowers gang leaders, which increases the potential for strong-arming, violence, introduction of contraband, group resistance and coordinated gang activities; and

- Gang activities become more difficult to monitor and control with inmate-led groups.

Plaintiff rejoins that he has observed Muslim inmates lead services (and has led them himself) and there has never been a problem. (Plaintiff also states flatly that Wisconsin prisons have never had a problem with Muslims leading services, but he does not have personal knowledge to back up this blanket statement.)

4

DOC correctional institutions have had a difficult time identifying and maintaining Islamic volunteers to come to institutions on a weekly basis, because most Islamic leaders have their own mosques for which they are responsible for providing leadership.  Defendant Teslik has contacted Islamic leaders with whom he has had contact during his employment with DOC, and has asked them for names of potential Islamic leaders who would be willing to volunteer, but due to time, work and travel constraints, many of the Islamic leaders that he has contacted were not able to commit to coming to the institution on a regular basis.  Over the past eight years, Teslik estimates that he has contacted at least ten Islamic organizations or volunteers in an effort to request their assistance in providing services at CCI.  DOC directly employs two Islamic chaplains, and Teslik has at times requested one of them come to CCI to lead Jumu'ah or Eid prayers, but due to time and work constraints, they are not able to come to CCI on a regular weekly basis.  As a Protestant chaplain, Chaplain Teslik is not allowed to lead prayers in the absence of an Islamic volunteer.

### C. Weekly Services

As part of his Muslim beliefs, plaintiff believes that every Friday he must participate in Salat-ul-Jumu'ah (Friday Prayers).  Salat-ul-Jumu'ah is a congregational prayer only and cannot be offered alone.  An imam is necessary to lead Jumu'ah prayers.  Plaintiff believes that the imam can be any Muslim in attendance.

Plaintiff also believes that although it is not obligatory that he attend weekly Talim (Islamic Study Group), he believes that he is "required" to do so in order to learn more about

Islam and raise questions about Islamic affairs.   Plaintiff does not explicitly state that an imam is necessary for Talim, but I can infer from both sides' proposed findings that this is the case.

There was a time at CCI where defendant Petras, the former corrections program supervisor at CCI, did, on occasion, allow the inmates to lead Jumu'ah prayer when there was no volunteer available, based on rotating the leader among the group.  The parties dispute what occurred under this policy, with defendants stating that the inmates refused to cooperate, and plaintiff denying this.  Ultimately, the practice of having inmate-led Jumu'ah prayer when a volunteer was not available was discontinued.

When plaintiff was incarcerated in the Waupun, Columbia and Green Bay Correctional Institutions between 1995 and 2001, he was never deprived of the opportunity to attend Jumu'ah, Eid, or Talim due to the absence of an imam, mainly because there was a fellow prisoner who served as an imam.  Also, plaintiff includes testimony from Joseph White, who was imprisoned in the federal prison system from 1992-2000 and who witnessed inmates lead Islamic services.

On July 3, 2007, plaintiff was transferred from the Wisconsin Secure Program Facility to CCI, where he immediately signed up to participate in all Islamic activities.  Plaintiff learned quickly after arriving at CCI that defendants Grams, Petras, Raemisch, Campbell and John Doe were enforcing a policy that no longer allowed prisoners to be imams and lead Jumu'ah and Talim.  Instead, Jumu'ah and Talim would be held when an outside Islamic volunteer was available to come to CCI to lead those services.  If the volunteer was unable to make it to CCI to lead those services, then the services would be canceled.  After becoming employed by the DOC, defendants Grosshans, Teslik, Meisner and Schueler have also participated in enforcing

the policy.  Because the prison relies on volunteer leaders, these services are sporadic.  Muslims

who have been imprisoned at CCI between July 2, 2007 to the present and the date of his filing

have missed weekly services over 150 times.  Plaintiff notes further that he has been imprisoned

in all five of Wisconsin's maximum-security prisons, and each one of them has had a Christian

chaplain.  At least one Wisconsin prison currently has a Muslin chaplain.

Plaintiff filed multiple grievances about the denial of services, all of which were denied.

In one of the denied grievances, the investigator cited Division of Adult Institutions Policy,

309.61.01 stating:

> Consultation with Ms. Petras reveals that the volunteer has been
> coming to CCI on a regular basis. When the volunteer does not
> come to the institution, the service or prayer cannot be held. This
> is not a matter of the institution not providing opportunities or
> soliciting volunteers, this is more a matter of the volunteer not able
> to make the service. CCI is working with the present volunteer to
> find a back up volunteer so regular weekly religious services and
> study groups can be held. There has been no negligence on the part
> of the institution. The inmate is urged to concentrate on other
> noted methods of religious practice in the absence of a volunteer.

On October 6, 2008, in response to plaintiff's multiple grievances, defendant Petras stated,

"[T]he current Muslim spiritual leader is able to come to CCI every other week."

On November 25, 2009, in response to a prisoner's complaint about being deprived of

Jumu'ah and Talim at CCI due to no outside Islamic volunteer, Petras wrote:

> On Oct. 23rd, CCI's Islamic spiritual leader told the Muslim group
> that neither he nor his brother-in-law would be able to come to
> CCI for the month of November and Dec. 4. With that
> knowledge, CCI Chaplains made several attempts to contact the
> Madison Mosque for someone to do services during this absence.
> The Chaplains sent the appropriate forms for volunteer sign-up

and followed with phone calls. No response has been received from
the Madison Mosque.

On December 28, 2010, CCI staff were notified via e-mail that CCI's Muslim volunteer was going to be out of the country until the end of January of 2011 and that the backup volunteer would be out of state until February of 2011.  A memo was posted on the CCI units stating that due to this unavailability of the spiritual leaders, there would be no Muslim services until the end of January of 2011.

On July 22, 2011, during Talim, Teslik mentioned to plaintiff and the other Muslim prisoners how inmates were able to lead Muslim services at the New Lisbon Correctional Institution, where Teslik had previously worked.  Plaintiff and the others told Teslik that they were interested in having inmates lead services.  On July 29, 2011, Teslik wrote plaintiff, stating that Janel Nickel informed him that "CCI will not allow inmates to lead prayer on Fridays at Jumu'ah when the outside volunteer is unable to be here."  Plaintiff filed a formal complaint about the decision but it was ultimately rejected by defendant Meisner.

On June 6, 2012, during Talim, the outside Islamic volunteer told plaintiff, in defendant Teslik's presence, that he would no longer be coming to CCI because he had to teach elsewhere. Plaintiff asked Teslik what he planned to do about having no Islamic volunteer, and Teslik responded that he had sent out applications for another volunteer.  On June 10, 2012, plaintiff wrote Teslik and asked for his permission to allow a Muslim prisoner to lead Jumu'ah and Talim services until he is able to get an outside Islamic volunteer.  On June 12, 2012, Teslik denied plaintiff's request.

On August 3, 2012, after Talim, Teslik asked the new outside Islamic volunteer whether would he come back again, and the volunteer said he could come once a month. For a time, Islamic study materials were made available for Talim on the institution television channel until the time of the August 2012 lockdown (plaintiff points out that this greatly limited the ability of inmates to discuss study materials with each other). From March 29, 2013 to May 3, 2013, Teslik offered Talim study by "electronic medium" (I assume this means television) on Fridays when there was no Friday volunteer available to lead Jumu'ah. Chaplain Zacariah Nurdeen, a chaplain with Racine Correctional Institution, had advised him that the inmates can do "Zuhr" prayer in their cells followed by attending the weekly Talim study by electronic medium.

In the past, resources were not available to offer a stipend and mileage for the Islamic volunteer to conduct Tuesday services. Once Teslik became aware that further resources were available to offer stipend and mileage for another day of the week, he made new arrangements with the current Islamic volunteer at CCI, Bath Fall. The current plan is to offer Islamic services on a rotation of Tuesdays and Fridays. Every other Friday there will be an hour of Jumu'ah prayer and an hour of Talim study. For the weeks where Fall is not available to come to CCI on that Friday, he will come to CCI on Tuesday instead to offer an hour of the Zuhr prayer and an hour of Talim study. (Plaintiff states that Fall "does not come to CCI every other Friday" but does not provide an account of when he does come.)

Islamic group ceremonies can be contrasted with the Native American religious group services. During the Native American Services at CCI, the prisoners get to choose two inmates to participate in their "pipe and drum" and "sweat lodge" activities. It is disputed precisely what two prisoners' roles are. Plaintiff states that the prisoner "loads the pipe with tobacco."

9

Defendants states that there are two pipes, and that "the pipe carrier is chosen to assist by loading the group pipe while the volunteer leader loads his pipe."

Plaintiff states that a second prisoner "looks after the drum during the services and the prisoner leads the prayer usually sung over the drum, and the other prisoners sing after him." Defendants states that "[t]here is no drum carrier during the Pipe and Drum service. Informally, one or two inmates may teach a song to other inmates who are playing the drum."

When there is no Native American volunteer present, the group does not hold a pipe/drum ceremony, and the Native American group does not meet. An exception occurred in March of 2013 at CCI, when the volunteer was going to be away for three weeks. Defendant Teslik showed a video to the Native American group for three weeks. During this time, there was no inmate chosen to function as the pipe carrier because a pipe ceremony was not held due to the lack of a volunteer. Teslik or a correctional officer were present at all times when the volunteer was unavailable.

### D. Eid al-Fitr Feast

Ramadan is an annual Islamic religious observance period in which adherents practice fasting for approximately one month. During Ramadan, Muslims are required to fast from dawn until sunset. The conclusion of Ramadan is celebrated by the Eid al-Fitr (Eid), which is held on the first day of the month of Shawal (the day after the month of Ramadan), and consists of the Eid al-Fitr prayer, feast and other celebratory actions. Plaintiff does not explicitly state that an imam is necessary for Eid, but I can infer from both sides' proposed findings that this is the case.

DAI Policy #309.61.01 provides for one opportunity per year for a celebratory meal or observance, if required by the designated religious preference.  Islamic inmates at CCI are permitted to participate in an Eid al-Fitr feast meal.  In accordance with Islamic tradition, this meal celebrates the end of the Ramadan fasting. Inmates from various general population units gather together in the chapel to pray and share in the meal.

Since his imprisonment at CCI, July 3, 2007, plaintiff has participated in every Ramadan. In 2007, Ramadan ended on October 12 at sunset, which set the Eid al-Fitr celebration for October 13. However, defendants Petras, Campbell and Grams agreed to have the Eid al-Fitr on October 19, 2007, which Petras stated was because, "the Muslim volunteer chooses the date of the feast based on their availability.  The date of 10/19/07 was the date they choose to have the feast."

In 2008, plaintiff wrote Petras and Grams regarding his concern to them about the Eid al-Fitr being held late and requested that they intervene.  In response, Petras, Campbell and Grams told plaintiff that it was not mandatory to have the Eid al-Fitr within a specific time and that it will be "scheduled in accord with the Muslim volunteer and the institution schedules," the volunteer's recommendations and the "DAI Policy on Religious Activities." Consequently, the Eid al-Fitr was held on October 2, 2008 instead of October 1.

In 2009, Ramadan ended on September 19 at sunset, so the Eid al-Fitr was September 20, 2009.  By September 22, 2009, the Eid al-Fitr had not occurred at CCI, leading plaintiff to inquire why it had not yet taken place.  On September 25, 2009, defendant Petras responded, "Although CCI was able to schedule the annual Islamic Feast on either Monday, 9/21/09 or

Tuesday, 9/22/09, neither of the Muslim Imams could make it on either of those two days. The soonest they could come to CCI for the Feast was Wednesday, 9/23/09."

In 2012, Ramadan ended on August 18 at sunset, which set the Eid al-Fitr celebration for August 19, 2012.  Pursuant to the instructions provided to DOC chaplains by the DOC Religious Practices Advisory Committee, which establishes uniform religious practices in all DOC correctional institutions, the time frame established for institutions to hold 2012 Eid celebrations was to occur between August 19 and 25, 2012.  Although chapel staff tries to schedule the Eid observance for the day after Ramadan, this is usually not possible because CCI Islamic volunteers generally observe Eid with their own families and mosques and there would not be sufficient time for the volunteers to travel from their community to CCI in order to lead the Eid observance the day after Ramadan.

Defendant Teslik scheduled the 2012 Eid observance for August 21, 2012 in accordance with the instruction that was given to him by the DOC Religious Practices Advisory Committee and he proceeded with the plans necessary for an Islamic volunteer to lead Eid prayers and for the CCI food services to provide a celebratory meal after the prayers for all inmates who had signed up for the Eid observance.  CCI went on lockdown status on either August 19 or 20, 2012.  Lockdown in prison means that the inmates are confined to their cells and security is tightened following a disturbance. Therefore, it was necessary for Teslik to cancel the Eid prayers and celebratory meal on August 21, 2012. This is the first time that Teslik can recall where the Eid observation had to be postponed or rescheduled due to lockdown status.

Given the unusual and unanticipated circumstances, Teslik obtained the warden's permission to reschedule the Eid prayers and celebratory meal for August 31, 2012, even though

12

it was not within the time frame provided by DOC's Religious Practices Advisory Committee. In lieu of the missed Eid prayers of August 21, 2012, Jumu'ah prayers were held and led by Chaplain Nurdeen on August 31, 2012, followed by the celebratory meal.  Plaintiff does not believe that the replacement ceremonies qualify as true Eid al-Fitr celebrations

### E. Ramadan Sunset Meals

During Ramadan, Muslims fast from sunrise to sunset.  Plaintiff states that in 2011, Ramadan started on August 1 and ended August 29. (Defendants object to this fact as lacking foundation or authentication but they do not develop an argument explaining why plaintiff cannot aver to this fact as a Muslim, so I will consider it undisputed.)  In 2012, Ramadan began at sunset on July 19 and ended on August 18.

On July 22, 2011, during Talim, plaintiff and other Muslims complained to the outside Islamic volunteer, in defendant Teslik's presence, about delays in the delivery of Ramadan sunset meals, and further suggested that Teslik issue a memo informing all of the units that the sunset meals be issued at 7:30 p.m. for the duration of Ramadan, which would allow Muslims to already have their sunset meals in their possession to break their fast when the sun sets without having to rely on the unit staff to timely serve them[3].  After approximately half an hour of debating with Teslik about the meals, Teslik agreed to "talk to staff" and see if he was able to do it.  On July 29, 2011, during Talim, Teslik announced that after consulting with "staff," the sunset meals would be served permanently at approximately 8:30 p.m. for the duration of

---

[3] The parties dispute whether the Muslim inmates wanted meals served consistently at 7:30 p.m. or wanted then serves precisely at sunset every day (an obviously trickier proposition), but because defendants appear to concede that the inmates were requesting 7:30 meals, I will treat this fact as undisputed for purposes of the parties' motions.

Ramadan.  (The parties dispute whether the meals were being served at 8:30 even before this discussion, with defendants saying that they were, but plaintiff stating that they were provided "for the most part according to the sunset prayer schedule.")

Teslik later stated that he "worked with" defendants Lipinski (the security supervisor) and Bennett (the food service manager) to determine the time that the Ramadan evening meals would be available.  The reason that Teslik gave for the 8:30 p.m. time slot was that it was the time when prescribed medications are distributed on the units.  Teslik also states that he consulted a website (www.islamicfinder.org) showing prayer time schedules (including what I understand to be a prayer that occurs at or immediately after sunset, called Maghrid), and concluded from the schedule that the 8:30 time would be appropriate.[4]  8:30 is generally about as late as prisoners are allowed to be out of their cells.

Defendant Teslik states that he has spoken to plaintiff and other Muslim inmates at CCI who have requested that they have their evening meals delivered to them immediately after sunset.  Defendant Lipinski recalls some conversations in person and by email regarding the time of delivery of the evening meal bag during Ramadan in 2011.  Lipinski states that he would have been brought into those conversations because, as shift captain, he was responsible for the safety and security of the staff and inmates and daily after-hours operations.

---

[4] As I stated in the order denying plaintiff's motion for preliminary injunctive relief, the website http://www.sunrisesunset.com indicates that in Portage, Wisconsin, the sun set at 8:34 p.m. on July 19, 2012 and at 7:57 p.m. on August 18, 2012.  For the 2011 Ramadan month, this website shows that sunset in Portage ranged from 8:22 p.m. to 7:41 p.m.

14

Defendants state that the evening meal delivery time of 8:30 p.m. was chosen because that is also the time that inmates generally receive evening medications[5] and the time was consistent with the prayer schedule shown online. Correctional institutions must operate under tight time frames to ensure all required inmate needs are met. Throughout a typical day in the institution, unit staff is required to perform numerous activities at standard and uniform times throughout the day, such as daily counts, supervising inmates' dayroom and recreation activities, and ensuring that inmates are supervised and receive health services, education, employment training and other programming needs. Staff cannot displace these necessary services because offsetting staff's required functions or schedule could displace other inmates and their various needs or lead to staff confusion. It takes notice, planning, and a coordinated effort with CCI staff to accommodate the evening Ramadan meal schedule, and the 8:30 p.m. time allows staff to maintain the typical daily scheduling of activities as much as possible while providing Islamic inmates with their evening meal after sunset.

Plaintiff states that in previous years at other prisons, staff have made accommodations for Ramadan meals—plaintiff's proposed finding is difficult to understand but he appears to be saying either that Muslim inmates were able to receive their sunset meals precisely at sunset every day or that they were able to receive the meals at 7:30 p.m. every day.

---

[5] Plaintiff states that the medication distribution time is often pushed back to as late as 9:00, but he does not assert that the meal time was also pushed back this late.

On June 26, 2013 (in advance of the 2013 Ramadan month, running from July 8 to August 7), defendant Teslik posted a memo stating that the sunset Ramadan meals "will be available to distribute to inmates no later than 8:00 p.m."[6]

The bag meals are prepared well in advance and delivered to the housing units for refrigeration prior to the housing unit staff delivering the meals.  The meals generally contain cold cuts, fresh fruit, raw vegetables, potato chips, and canned tuna.  Defendants believe that "[i]t would not have been good practice to remove the bags from refrigeration much earlier than they were intended to be consumed for food quality and safety."

Bennett states that he did not have any authority or any part in determining the times of the evening meal delivery by unit staff to inmates during Ramadan. Teslik states that in 2011, he was new to the institution and was not aware of past procedures and security issues involved with Ramadan meal delivery.  He states also that he relayed the Islamic inmates' concerns about the 8:30 p.m. time to the appropriate officials, and relayed what information he learned from security and food service staff back to the Islamic inmate group.

## II.  Opinion

### A.  Summary Judgment Standard

Summary judgment is appropriate in a lawsuit when there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

---

[6] Although the parties do not explain more about the 2013 Ramadan month, the court can take judicial notice that sunset for this month ranged from 8:41 p.m. to 8:14 p.m.

P. 56(a).  "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'"  *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)).  In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party.  *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007).  Even so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, he must come forward with enough evidence on each of the elements of his claim to show that a reasonable jury could find in his favor.  *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

### B. Plaintiff's Claims Relating to Religion

Plaintiff claims that his rights under the Free Exercise Clause of the First Amendment and under RLUIPA are being violated because he is not permitted to participate in weekly Jumu'ah and Talim, or to participate in the annual Eid al-Fitr feast, unless an outside volunteer comes in to the institution to lead these activities.  Over the past several years, plaintiff claims that he has been denied Jumu'ah and Talim over 100 times, and the Eid al-Fitr feast has often been held later than the day after Ramadan ends because of the unavailability of a volunteer.

17

### 1. Free Exercise Clause

The Free Exercise Clause of the First Amendment applies to the states by virtue of the Fourteenth Amendment. *See Employment Division v. Smith*, 494 U.S. 872, 876–77 (1990). The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. Amend. I.

In previous cases this court has expressed uncertainty regarding the appropriate standard of review on free exercise claims. *E.g., Kramer v. Wisconsin Dep't of Corrections*, No. 10-cv-224-slc (W.D. Wis. Jul. 26, 2011). The primary question is whether *Employment Division v. Smith*, 494 U.S. 872 (1990), or *Turner v. Safley*, 482 U.S. 78, 89–91 (1987), or both, control(s) the analysis. Under *Smith*, the question is whether the restriction targets the plaintiff's religion for adverse treatment and is not a neutral rule of general applicability. In other words, a believer is not entitled to a religious accommodation under *Smith* unless adherents of other faiths are receiving more favorable treatment. Under *Turner*, the question is whether the restriction is reasonably related to a legitimate penological interest. In determining whether a reasonable relationship exists, the Supreme Court usually considers four factors: whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; whether alternatives for exercising the right remain to the prisoner; what impact accommodation of the right will have on prison administration; and whether there are other ways that prison officials can achieve the same goals without encroaching on the right. *Id.* at 89.

The confusion arises because the Supreme Court applied *Turner* to a prisoner free exercise claim in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), three years before the court decided *Smith*. Because the Supreme Court has not addressed another prisoner's free exercise claim since

18

*O'Lone*, the Court of Appeals for the Seventh Circuit has stated that it is an "open question" whether prisoners are entitled to religious accommodation under the free exercise clause. *Lewis v. Sternes*, 712 F.3d 1083, 1085 (7th Cir. 2013). *But see Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) (assuming that *Smith* applies to prisoner claims), and *Koger*, 523 F.3d at 796 (same). In *Crouthers v. Zager*, No. 10-cv-308-bbc (W.D. Wis. Feb. 28, 2011), the court concluded that *Smith* did apply to prisoner claims, reasoning that it would make no sense to interpret the free exercise clause as granting a right of religious accommodation to prisoners but not to nonprisoners because it would result in prisoners having more expansive free exercise rights than nonprisoners under some circumstances. *See also Grayson v. Schuler*, 666 F.3d 450, 452-53 (7th Cir. 2012) (stating in dicta that *Smith's* "holding should apply to prison inmates along with everyone else").

Another question under the Free Exercise Clause is whether the plaintiff must show that the defendants have substantially burdened his practice of his religion, or whether plaintiff must show only that his beliefs are sincere. *Compare Grayson*, 666 F.3d at 454-55 (question is whether prisoner's conduct is "religiously motivated"), with *Kaufman v. McCaughtry*, 419 F.3d 678, 682-83 (7th Cir. 2005) (requiring prisoner to show substantial burden in free exercise claim brought by prisoner).

In this case, it is unnecessary to choose one of these standards over the others. As I stated in the March 25, 2013 order denying plaintiff's motion for preliminary injunctive relief:

> the problem for plaintiff is that it is well established that prison officials are justified in requiring an approved nonprisoner to lead prisoners in group worship. *Johnson-Bey v. Lane*, 863 F.2d 1308, 1310-11 (7th Cir. 1988) (prison officials "need not . . . allow inmates to conduct their own religious services, a practice that

19

might not only foment conspiracies but also create (though more likely merely recognize) a leadership hierarchy among the prisoners"); *Hadi v. Horn*, 830 F.2d 779, 784-85 (7th Cir. 1987) (rejecting claim that Muslim prisoners were entitled to lead their own services when chaplain or volunteer was not available).  *See also Adkins v. Kaspar*, 393 F.3d 559, 565 (5th Cir. 2004) (upholding prison requirement that volunteer must supervise religious services); *Tisdale v. Dobbs*, 807 F.2d 734, 738-39 (8th Cir. 1986) (same).

Nothing substantive has changed.  Defendants again have presented testimony indicating that security concerns would be implicated by allowing group services to be held with inmate leaders when an outside volunteer is not available.  They state that:

- "[a]llowing inmates to lead religious activities would give a perception of authority over other inmates and could allow an inmate to influence other inmates' actions,"

- "allowing an inmate to lead other inmates disrupts the power dynamics in a prison,"

- "DOC historically and continually has had problems with gangs attempting to take over religious groups,"

- "[a]llowing an inmate to lead a religious group empowers gang leaders, which increases the potential for strong-arming, violence, introduction of contraband, group resistance, and coordinated gang activities."

Defendants also note in regard to the Eid feast that security concerns related to an institutional lockdown in 2012 forced a delay in that ceremony.

These facts were sufficient to defeat plaintiff's motion for preliminary injunctive relief; they doom his claim on summary judgment as well.  Additionally, defendants now present the

many other undisputed ways Muslim inmates are able to practice their faith,[7] which tends to indicate that Muslim inmates are not significantly burdened by the group service restrictions.

The only new issue plaintiff raises at the summary judgment stage is evidence that the institution *does* allow prisoners to take leadership roles in groups in certain situations.  Plaintiff shows that inmates are allowed to take "captain" or "manager" roles on softball and basketball teams, that Native American inmates arguably are involved in leadership roles in their ceremonies and that plaintiff personally has never witnessed a problem in the past when inmates used to be able to lead groups.

The sports team captain example is an apples-to-oranges comparison.  Comparing and contrasting sports teams with religious groups would lead to as many differences as similarities. DAI Policy # 309.61.01 addresses only religious worship, and there is no reason to think that allowing inmates to have leadership roles on sports teams invalidates the rationale undergirding the prohibition against inmate leadership over religious services.

More on point is plaintiff's assertion that prisoners are allowed to lead Native American services.  However, plaintiff has not provided evidence that inmates actually *lead* these services. Instead, it is undisputed that inmates *participate* pipe and drum services that are overseen by the outside volunteer.  When the outside volunteer is not present, then the services are not held. Thus, the participation of inmates in the Native American services does not show that Muslim

---

[7] These include religious diet requests, individual study, personal meditation, utilization of religious books and/or property, individual religious observance in living quarters, correspondence with fellow believers, pastoral visits and requesting to abstain from work or program on religious days of observance.

inmates are being treated differently, or that there are obvious alternatives to the current policy regarding Islamic ceremonies.  As with their Islamic counterparts, Native American inmates may not conduct group religious ceremonies unless a volunteer is present to lead them.  Therefore, I conclude that plaintiff fails to show that defendants have violated his rights under the free exercise clause.

Moreover, defendants argue that even had this court were to conclude otherwise and find that defendants' actions did violate the Constitution, defendants still would be entitled to summary judgment pursuant to the doctrine of qualified immunity.  A defendant's claim of qualified immunity requires the court to answer two questions:  (1) whether the defendant violated a constitutional or statutory right of the plaintiff; and (2) whether this right was clearly established at the time of the alleged misconduct.  *Gonzales v. Village of West Milwaukee*, 671 F.3d 649, 657 (7th Cir. 2012) (citing *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010)).  Even when the answer to the first question is yes,

> the plaintiff bears the burden of defeating [the qualified immunity defense] either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully.

> *Abbott*, 705 F.3d 706 at 723-24 (citing *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

To determine whether a right is clearly established, courts must look at the right in a "particularized" sense, rather than "at a high level of generality;" however, it is not necessary that the very action in question previously have been held unlawful.  *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) (quoting *Safford Unified Sch. Dist. v. Redding,* 557 U.S. 364, 377 (2009); *Brosseau*

22

*v. Haugen*, 543 U.S. 194, 199 (2004)).  The basic question is whether the state of the law at the time gave defendants reasonable notice that their actions violated the Constitution.  *Id.*  "[T]he contours of the right [must be] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Findlay*, 2013 WL 2992392 at *3 (citing *Denius v. Dunlap*, 209 F.3d 944, 950 (7ᵗʰ Cir. 2000)).

In this case, precedent is on the defendants' side: there is no clearly established right to group worship led by an inmate.  *Kramer v. Pollard*, 497 F. App'x 639, 643 (7th Cir. 2012) ("permitting prison administrators to deny group worship where no volunteer or chaplain is readily available to lead services, a reasonable government official would not have known the official was violating clearly established law"), citing *Hadi v. Horn*, 830 F.2d 779, 781, 784–85 (7th Cir. 1987); *Baranowski v. Hart*, 486 F.3d 112, 120–22 (5th Cir. 2007); *Spies v. Voinovich*, 173 F.3d 398, 402, 405–06 (6th Cir.1999).  *See also Johnson-Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988) (prison officials "need not . . . allow inmates to conduct their own religious services, a practice that might not only foment conspiracies but also create (though more likely merely recognize) a leadership hierarchy among the prisoners").  Thus even if I were to have concluded on these facts that defendants violated plaintiff's Free Exercise rights, the defendants nevertheless would be entitled to summary judgment on the ground of qualified immunity.

## 2. RLUIPA

Under RLUIPA, plaintiff has the initial burden to show that he has a sincere religious belief and that his religious exercise was substantially burdened.  *Koger v. Bryan*, 523 F.3d 789, 797-98 (7th Cir. 2008); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 996-97 (7th Cir.

2006).  Once a plaintiff shows that a restriction substantially burdens his exercise of his religion, then defendants must show that the restriction furthers "a compelling governmental interest," and does so by "the least restrictive means." *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005).  Courts apply RLUIPA "with particular sensitivity to security concerns," and must afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* at 723.

The protections offered by RLUIPA are broader than those extended under the Free Exercise Clause. *Cf. Mark v. Gustafson*, 482 F.Supp. 2d 1084, 1090 (W.D. Wis. 2006) (if a claim fails under RLUIPA, then it will inevitably fail under the First Amendment's more stringent requirements on a plaintiff).  The broader scope of RLUIPA, coupled with the dearth of precedent regarding RLUIPA's application to the prohibition on inmates leading group services, makes it more difficult to determine whether plaintiff's claim might succeed on the merits.  It is arguable whether plaintiff's rights were *substantially* burdened by the requirement that outside volunteers lead group services, where the evidence shows that Jumu'ah and Talim were held *less often* than he wished and that the Eid al-Fitr feast was held *later* than normal.  Put another way, the prison's policies impinged somewhat on the optimal practice of these ceremonies, but even so, plaintiff had opportunities to participate in these services.  The wide variety of other religious practices in which Muslim inmates were permitted also militates against concluding that the restriction on group practice substantially burdened plaintiff's practice of his religion.  These points are not meant to be dismissive of plaintiff's concerns, but to observe that the metrics of determining the substantiality of a burden are not clear cut.

In any case, the lack of clear precedent on this issue supports defendants' claim of qualified immunity.  As stated above regarding plaintiff's Free Exercise claims, there is no basis to conclude that prison officials violated a "clearly established right" by requiring group religious services to be led by an outside volunteer, particularly when this effects of this rule arguably did not cause a substantial burden on the ability of Muslim inmates to exercise their religion. Defendants are entitled to summary judgment on plaintiff's RLUIPA claims.

### C. Retaliation claim

Plaintiff's final claim is that defendants Teslik, Lipinski and Bennett violated plaintiff's First Amendment rights by serving Ramadan meals as late as possible, as retaliation against plaintiff for debating with Teslik about when to properly serve those meals.  To state a claim for retaliation, a plaintiff must identify: (1) the constitutionally protected activity in which he was engaged; (2) one or more retaliatory actions taken by each defendant that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) sufficient facts to make it plausible to infer that the plaintiff's protected activity was one of the reasons defendants took the action they did against him.  *Bridges v. Gilbert*, 557 F.3d 541, 556 (7th Cir. 2009).  As an initial matter I note that the state tries to absolve Teslik and Bennett of responsibility for placing the meal time at 8:30 p.m., but defendants' testimony as a whole indicates that each of them had input in the decision.  Therefore, I will not grant summary judgment to these either of these defendants on the ground that he was not personally responsible for the decision.

25

### 1.  Protected conduct

Defendants argue that plaintiff fails to show that he was engaged in constitutionally protected conduct.  The undisputed facts show that plaintiff and other Muslim inmates complained about the late meal times to an Islamic volunteer in Teslik's presence, and then "debated" the issue for a half hour with Teslik.  Although a prisoner has "a general First Amendment right to criticize [prison] policies," he must do so "in a manner consistent with his status as a prisoner.  Instead of openly criticizing [the official's] directives during a meeting with other [prisoners]," prisoners can take "the less disruptive approach of filing a written complaint." *Ripp v. Nickel*, 10-cv-492-bbc (W.D. Wis. Sept. 21, 2010) (quoting *Watkins v. Asper*, 599 F.3d 791, 797 (7th Cir. 2010) (internal quotation omitted)).  In other words, a prisoner's "loud and boisterous" oral complaints to a prison official in front of other prisoners are less likely to receive First Amendment protection because they can "impede[] [the official's] authority and . . . ability to implement [prison] policy."  *Id*.

In the present case, the parties dispute whether plaintiff acted in a manner consistent with his status as a prisoner.  The summary judgment record is not clear on how boisterous the "debate" over the meals was.  I am dubious whether complaining about the meals to the Islamic volunteer in front of Teslik while other inmates are listening was a sufficiently diplomatic way to grieve the prison's policy.  That said, the record is roiled enough that plaintiff is entitled to the benefit of the favorable inference that he respectfully informed defendant that plaintiff intended to file a grievance and lawsuit.

### 2.  Deterrent effect

Plaintiff's claim fails at the second element because the alleged retaliation would *not* likely deter a person of ordinary firmness from continuing to engage in protected activity.  "It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).  Defendants initially argue that there was no harm to plaintiff because the Ramadan meal delivery time was 8:30 p.m. *before* the debate with Teslik.  Plaintiff states that the meals were provided "for the most part according to the sunset prayer schedule," although by his own admission he complained to the Islamic volunteer and Teslik about "historical delays" in the provision of meals, so it is unclear when these meals were being served.

Thus, the evidence is precariously thin to support plaintiff's contention that the meal service  actually was pushed back to 8:30 p.m. as opposed to being at 8:30 p.m. all along, but I will assume that the evidence suffices.  Moving the meal service back to  8:30 p.m. would be unlikely deter a person of ordinary firmness from complaining about prison issues in the future. In 2011, an 8:30 p.m. meal time ranged from slightly before sunset to 33 minutes after. In 2012, an 8:30 p.m. meal time would result in meals served from 8 to 49 minutes after sunset.[8] Plaintiff provides no authority suggesting that this type of a delay in meals for fasting prisoners is sufficient to deter a person of ordinary firmness.  The meager case law that exists and common sense both suggest that it is not. *See Graham v. Knebel*, 2009 WL 4334382 (S.D.N.Y. Dec. 1,

---

[8] Plaintiff did not amend his complaint to include the 2013 Ramadan month, although the facts show that the meal time was moved up to 8:00, so there was even less of a problem.

2009) (delay of about 40 minutes in Ramadan sunset meal does not plausibly deter person of ordinary firmness). As for common sense, would a Muslim devout enough to fast all day every day during Ramadan abandon his complaint of religious interference merely because his non-Muslim captors forced him to wait an additional eight to forty-nine minutes after sunset to receive nourishment? The question answers itself.

Moreover, as with plaintiff's religious claims, even if I were to conclude that defendants' actions did violate his First Amendment rights, I still would grant summary judgment to defendants on their claim of qualified immunity. The parties's briefs, supplemented by the court independent research, do not reveal any case law establishing that these short delays in the provision of "sunset" meals are legally problematic. This is true whether one looks at the issue through the lens of retaliation cases, such as *Graham*, or through the concept of a free exercise or RLUIPA claim regarding the provision of sunset meals. Although there is no question that prison officials must allow inmates to participate in Ramadan and must provide inmates with nutritionally balanced meals with sufficient caloric value, plaintiff does not point to any precedent suggesting that the type of delay detailed here violated his rights, and the court can locate none. Accordingly I will grant defendants' motion for summary judgment (and deny plaintiff's) on this claim.

## REMAINING MOTIONS

Following the completion of briefing on the cross motions for summary judgment, plaintiff filed a motion stating that prison staff is planning on limiting the amount of legal files in his cell and asking the court to intervene. Defendants state that they indeed confiscated

28

property not within the allowable limits but state that plaintiff's materials for this case fit well within the allowable property limits (all legal materials must fit in a box no larger than 20 inches long, 20 inches wide and 20 inches deep).  Plaintiff also filed a motion for appointment of counsel.  Both of these motions are moot because I am granting summary judgment to defendants on the claims in this case.  In any case, any claims plaintiff wishes to bring about his legal materials or other property do not belong in this lawsuit.

Plaintiff also asks for a "complete copy of the court's file."  Plaintiff is not proceeding *in forma pauperis*, so any copies of documents he would like will cost 50 cents per page.  I will attach a copy of the docket sheet so that plaintiff can see what copies he might want.


ORDER

It is ORDERED that:

(1)  Defendants' motion for summary judgment, dkt. 42, is GRANTED.

(2)  Plaintiff Mansa Lutalo Iyapo's motion for summary judgment, dkt. 51, is DENIED.

(3)  Plaintiff's motion regarding the storage of his legal file, dkt. 92 and his motion for appointment of counsel, dkt. 99, are DENIED as moot.

(4)  The Clerk of Court shall provide plaintiff with a copy of the docket sheet for this case so that he may order photocopies.

(5)  The Clerk of Court is directed to enter judgment in favor of defendants and close this case.

Entered this 8th day of November, 2013.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

29